**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS and KEVIN RAY,<br>Plaintiffs,<br>-against-<br>ZOHRAN MAMDANI, in his official capacity as Mayor of the City of New York; THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT OF SMALL BUSINESS SERVICES; KENNY MINAYA, in his official capacity as Commissioner of the New York City Department of Small Business Services; NEW YORK CITY DEPARTMENT OF EDUCATION d/b/a NEW YORK CITY PUBLIC SCHOOLS; and KAMAR H. SAMUELS, in his official capacity as Chancellor of New York City Public Schools,<br>Defendants. | Case No.<br>**COMPLAINT** |

1. Three decades ago, the Supreme Court held that all racial preferences in government contracting must satisfy "strict scrutiny." *Adarand Constructors v. Peña*, 515 U.S. 200, 227 (1995). Three years ago, the Supreme Court held that neither "diversity" nor an interest in "proportional representation" is compelling enough to satisfy strict scrutiny. *SFFA v. Harvard*, 600 U.S. 181, 214-30 (2023). And three months ago, the Supreme Court made clear that "our colorblind Constitution" does not tolerate the use of race to offset mere disparities in outcomes. *Allen v. Milligan*, 608 U.S. 511, 512 (2026).

2. Yet in 2026, our nation's biggest and most prominent city continues to resist the law. New York City still runs a minority-business-certification program that preferences businesses based on race and sex. That program awards lucrative contracts with every agency of the City and creates many more contracting opportunities for the businesses that qualify.

And to qualify, businesses must be at least 51% owned and operated by women or racial minorities.

3. Rather than bringing its policies in line with the law, the City is moving in the wrong direction. Under the leadership of Mayor Zohran Mamdani, the City just released its "first-ever New York City Racial Equity Plan," a 437-page document that reads like an ode to proportional representation and other illegal race-based decision-making. Among many other initiatives, the racial-equity plan promises to "continue" and even *expand* the City's preferences for minority-owned businesses.

4. Our colorblind Constitution does not "yield to the spirit of the Big Apple." *Wolford v. Lopez*, 146 S.Ct. 2032, 2050 (2026). "[L]ocal attitudes" might resist "the Fourteenth Amendment," but they can "ne[ver] shrink" its "meaning." *Id.*

5. The City's preferences injure contractors who cannot equally compete based on race and sex, like the Alliance's member Kevin Ray. This Court should nullify the City's program and award all appropriate relief.

## PARTIES

6. Defendant Zohran Mamdani is the Mayor of New York City. As Mayor, he is the City's chief executive officer. N.Y.C. Charter §3. He is charged by city ordinance with enforcing the City's minority- and women-owned business enterprise (M/WBE) program and must "ensure compliance" with its unconstitutional goals. N.Y.C. Admin. Code §6-129(m). Mamdani is sued in his official capacity.

7. Defendant City of New York is a municipality of the State of New York. Under the City's charter, the City's Department of Small Business Services must run "a centralized program" to certify M/WBEs "on behalf of the city." N.Y.C. Charter §1304(e)(6).

8. Defendant Department of Small Business Services is an agency of the City. §1300. It is responsible for "establish[ing] and operat[ing], on behalf of the city, a centralized program for the certification of minority owned business enterprises, [and] women owned business enterprises" in order "to ensure their meaningful participation in city procurement." §1304(e)(6).

9. Defendant Kenny Minaya is the City's Commissioner of Small Business Services. He is charged with heading the Department of Small Business Services and operating the City's M/WBE certification program. *See* §1300; §1304(e)(6). Minaya is sued in his official capacity.

10. Defendant New York City Public Schools is the City's school board. N.Y. Educ. Law §2590-b. It is authorized "to enhance minority and women owned business enterprise participation," especially of businesses that are certified pursuant to city ordinance. §2590-h(36).

11. Defendant Kamar H. Samuels is the Chancellor of the New York City Public Schools. He serves at the pleasure of the Mayor and has the "power and duty to … [d]evelop a procurement policy" for the City's public schools. *Id.* This policy must include "measures to enhance the ability of minority and women owned business enterprises," as certified under city ordinance, "to compete for contracts." *Id.* Samuels is sued in his official capacity.

12. Plaintiff American Alliance for Equal Rights is a nationwide membership organization dedicated to ending illegal racial classifications across the country. This challenge to a program that discriminates based on race and other immutable characteristics is squarely

within the Alliance's mission. *See Our Cases*, AAER, perma.cc/2ZHW-M2YJ (archived Sept. 30, 2026).

13. Plaintiff Kevin Ray is a member of the Alliance and an arts educator in New York City. As a sole proprietor, he contracts with the City as a "non-contracted vendor" to provide arts education programming (theater and music) in its public schools. He is harmed by the City's policy of favoring certified M/WBEs. He has lost opportunities for contractor work because he is a white male, and he cannot obtain M/WBE certification from the City.

## JURISDICTION AND VENUE

14. This Court has federal-question jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under the … laws … of the United States," including 42 U.S.C. §1983, the Fourteenth Amendment of the U.S. Constitution, and 42 U.S.C. §1981.

15. Venue is proper under 28 U.S.C. §1391 because Defendants reside here and the challenged discrimination occurred here.

## FACTUAL ALLEGATIONS

16. The City of New York runs an M/WBE certification program. This program is expressly authorized by the City's charter, its highest source of law. *See* N.Y.C. Charter §1304(e)(6) (authorizing the City's Department of Small Business Services "to establish and operate, on behalf of the city, a centralized program for the certification of minority owned business enterprises, [and] women owned business enterprises").

17. According to the City, this M/WBE certification program "helps you, as a minority and/or women entrepreneur, access government contracts and grow your businesses." "When you get certified with the City, your business becomes more visible to buyers, including City agencies and private contractors looking to purchase goods and services."

18. The City likewise touts the "Benefits of becoming a certified M/WBE." Certified businesses "will be listed" in the City's Online Directory of Certified Businesses—"a public website that promotes businesses" and "includes over 10,000 businesses from many industries."

19. If you "Certify with the City" as a "Minority or Woman Business Owner," you can also "Make NYC your next customer." "The City spends up to $17 billion per year on goods and services." So "[g]etting certified will help you compete for these opportunities and access exclusive programs to help your small business grow."

20. The City prominently posts the "Eligibility requirements for M/WBE certification." These requirements are: authorization to operate in New York State; at least one year of selling goods or services; a main office in one of the five boroughs (or various nearby counties) or a "substantial presence in the New York City market"; for-profit business status; one of several legal structures (including a sole proprietorship); and "[a]t least 51 percent … owned, operated and controlled by U.S. citizens or U.S. permanent residents who are women and/or members of designated minority groups." The designated minority groups are "Black," "Hispanic," "Asian-Pacific," "Asian-Indian," and "Native American." Businesses that are majority-owned by white males are ineligible.

21. These eligibility requirements are enshrined in the current version of the 2005 ordinance that enacted the certification program. These eligibility requirements include a strict 51% quota for certification: "For the purposes of determining whether an applicant should be certified as an MBE and/or WBE, or whether such certification should be revoked, the following rules concerning ownership will be applied: …

> A sole proprietorship must be owned by a minority group member and/or woman; …
>
> A partnership must demonstrate that minority group members and/or women have a fifty-one (51%) percent or greater share of the partnership; and …
>
> A corporation must have issued at least fifty-one (51%) percent of its issued and authorized voting and all other stock to minority group members and/or women shareholders."

Rules of the City of New York, tit. 66, §11-22(b)(2)-(4). The 51% requirement, enshrined in the ordinance, derives from the City's Charter. *See* N.Y.C. Charter §1304(e)(6)(b) ("For the purposes of such certification, 'minority owned business enterprise' and 'women owned business enterprise' shall mean business enterprises authorized to do business in this state … , in which … at least fifty-one percent of the ownership interest is held by … either minority group members or women").

22. The ordinance provides rigid racial categories to determine who qualifies as a "minority" for purposes of the program:

> (1) Black persons having origins in any of the Black African racial groups;
>
> (2) Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American descent of either Indian or Hispanic origin, regardless of race;
>
> (3) Asian and Pacific Islander persons having origins in any of the Far East countries, South East Asia, the Indian Subcontinent or the Pacific Islands; or
>
> (4) Native American persons who originate from any of the original peoples of North America and who maintain cultural identification through tribal affiliation or community recognition.

Rules of the City of New York, tit. 66, §11-21.

23. "Documentation may be required to substantiate the claim of membership in a minority group. This documentation may include, but is not limited to, birth certificates, foreign passports, naturalization papers, registration on Native American tribal rolls and nonresident visas." §11-22(d)(1).

24. The certification program is administered by the New York City Department of Small Business Services and its commissioner. *See* §11-23; §11-24; §11-25. If an applicant refuses to provide information required by the Department or declines to answer application questions, the application must be rejected. *See* §11-23.

25. The ordinance authorizes online applications. *See* §11-23(a). The current online application includes an "Eligibility Checklist" that asks: "Is the business at least 51% owned, controlled, and operated by a US citizen or permanent resident who is a member of a designated minority group including Black, Hispanic, Asian Pacific, Asian-Indian, and Native American OR a woman?"

26. The question is marked with a red asterisk because it is required. If an applicant does not answer "yes" to this question, a big red box appears, and he cannot proceed to complete the application.



Social and economic disadvantage

Operations

Supporting documents

Program feedback

Affirm and submit

The form could not be submitted for the following reasons:

If you cannot answer yes to each of the questions on this checklist, your business is not eligible for this certification.

If you have any questions about the requirements of this certification you can use the Support page.

Is the business structured as a Sole Proprietorship, General Partnership, Limited Partnership, Limited Liability Partnership, Limited Liability Company, or Corporation? *

Yes

No

Is the business authorized to do business in New York State? *

Yes

No

Is the business at least 51% owned, controlled, and operated by a US citizen or permanent resident who is a member of a designated minority group including Black, Hispanic, Asian Pacific, Asian-Indian, and Native American OR a woman? *

Yes

No

27. Without certification, a business misses out on valuable benefits. For example, the head of each City agency must "secure the meaningful participation of city certified business enterprises in the agency's (1) procurement of goods, services and construction and (2) financial, technical and managerial assistance programs for such business enterprises." N.Y.C. Charter §1304(f)(1).

28. The City sets "citywide participation goals for" M/WBEs to be awarded "prime contracts or subcontracts," including "[f]or professional services." N.Y.C. Admin. Code §6-129(d). Before soliciting bids, agencies must "establish participation goals" for M/WBEs. §6-129(i)(1). The City has a formula to determine whether an agency gets "credit" for "achiev[ing] … its annual goals." §6-129(j)(1). The City also has procedures that secure compliance with these racial contracting goals—starting with a performance plan and ending with the rescission of the agency's authority to process contracts. §6-129(m).

29. Ultimately, the Mayor is charged with enforcing these discriminatory contracting goals. "In the event that the agency fails to remedy its noncompliance after such informal efforts, the director and the city chief procurement officer shall submit such findings in writing to the mayor and the speaker of the council, and the mayor shall take appropriate measures to ensure compliance." §6-129(m)(2).

30. Kevin Ray has worked as an arts educator delivering theater and music programming in New York since 2002. He has delivered arts education programs in the City's public schools as a non-contracted vendor since the early 2010s.

31. Ray went to graduate school twice to further his career as an arts educator. He earned a Master of Arts in Applied Theater in 2011 from the CUNY School of Professional Studies. He also earned a Master of Fine Arts in Theater Directing from Brooklyn College in 2018. His work in these graduate programs equipped Ray with advanced knowledge in education theory and practice as well as advanced artistic tools and techniques that contribute directly to the specialized arts-education services that he provides through his business.

32. Ray has provided arts education to New York City public school students from pre-K through twelfth grade.

33. Many of the City's Title I public schools do not have full-time arts instructors for music and theater. In that situation, a school will periodically contract with an arts educator—like Ray—to complete a "residency" at the school.

34. In his past residencies, Ray has, for example, adapted Shakespeare for performance by high-school students learning English as a second language. He has also adapted

read-aloud books from the school curriculum for second graders to perform. And he has prepared students to sing at graduation ceremonies.

35. One City school where Ray has worked asked him if it would be possible for him to register as an M/WBE. It explained that, if he obtained this registration, he could do more work for the school.

36. On one occasion, for example, a school told Ray that it had $30,000 of funds to spend before the end of the school year. The school asked Ray if he could deliver additional programming. Because Ray had already procured two contracts with the school totaling roughly $7,000, Ray could not accept the full $30,000 as a non-contracted vendor because doing so would cause his total contracts with the school to exceed the $25,000 per-school cap on non-contracted vendors. Ray's status therefore prevented him from doing the full amount of work the school sought to give him.

37. That same school again encouraged him to get certified as an M/WBE, including by adding a woman or racial minority as a co-owner, operator and controller. But Ray would need two business partners of the appropriate race or sex to hit the 51% quota. And adding multiple business partners would fundamentally change his sole proprietorship. Ray also objects to making decisions based not on business factors, but on race and sex—discriminatory reasoning that he deems illegal and wrong. Ray does feel the pressure from the City's program, however, to discriminate based on race and sex in his business.

38. Ray has also seen the City's procurement portal, from the school's side. This portal, called FAMIS (Financial Accounting Management Information System), lets public schools make purchases from vendors. Ray saw that the portal listed a separate category for

M/WBE vendors. An official explained to him that schools are encouraged to pick vendors from that category first, before considering non-M/WBE vendors. When a representative from an NYCPS school selects the M/WBE category in FAMIS, Ray's business is not among the vendors displayed because it is not M/WBE-certified. As a result, Ray is excluded from competing for opportunities presented through that category.

39. The City's preference for M/WBE vendors has harmed Ray's business and continues to do so. As a non-M/WBE arts vendor, Ray's business is capped at earning $25,000 from all projects at a given school in any given year. If Ray's business were M/WBE certified, Ray could earn $1.5 million each year from the City, without any per-school cap, and without the need to go through any competitive process. *See* N.Y.C. Charter §311(i)(1) ("agencies may make procurements of … services … for amounts not exceeding one million five hundred thousand dollars from businesses certified as minority or women-owned business enterprises pursuant … without a formal competitive process"). He could not only earn more money but also apply and compete for more opportunities.

40. The website for the City's Department of Education is explicit about its policy of preferring certified M/WBEs. "City agencies, including the NYC Department of Education, may award contracts of up to $1,500,000 for … professional services, [and] standard services … directly to currently City-certified Minority and Women-owned Business Enterprises (M/WBEs) without formal competition using the MWBE Procurement & Contract Method. This streamlined process makes it easier for the City to do business with M/WBEs." Far from being capped at $25,000, "awards made through this method may result in a vendor exceeding $250,000 during the immediately preceding twelve-month period."

41. This preference for certified M/WBEs helps M/WBEs and harms their competitors. For example, Marie Saint-Cyr—an M/WBE arts vendor—rapidly grew her business from hardly any contracts to over $1 million in annual revenue from the City's public schools, which have recently been allocated as much as $75,000 per school per year for arts programming. Saint-Cyr's "team secured numerous contracts" and enjoyed "increased opportunities … particularly with government … contracts," which she attributes to her ability to get certified as a "Black woman-owned business." Per New York City's own "M/WBE Mentors" webpage, Saint-Cyr "has generated more than $3 million in school-based contracts across arts education, murals, and enrichment programming" as a non-contracted vendor with an M/WBE certification.

42. Ray would like to do more business in the City's public schools and earn more money from his existing clients, who have likewise expressed their willingness to pay him more. But none of this is possible because the City requires the schools to favor certified M/WBEs. If a court declared the City's M/WBE program illegal, then it would remove the artificial cap on the amount of work that Ray is qualified to do and would authorize him to do more business with the City's public schools. It would also empower Ray to compete with minority-owned businesses on an equal basis. It would result in more business from Ray's current clients, as well as business from new clients.

43. Ray at least wants to get the benefits of M/WBE certification for his business. His business satisfies all the City's nonracial criteria to get certified as an M/WBE. His business is legally allowed to operate in the State; it has been selling services for many years; it is a for-profit sole proprietorship; and its main office is within the City's five boroughs.

44. Ray is actively seeking to get more contracts with the City's public schools and would immediately apply for M/WBE status if a court ordered adequate relief. A current client has urged him to apply. The only reason that Ray has not already applied is because his white-male-owned business does not currently qualify under the City's illegal race- and sex-based criteria.

45. Ray is ready and able to fill out the online application for M/WBE certification. But he currently cannot proceed past the first page of the online application because of his race. If a court ordered the City to certify businesses without regard to their owners' race or sex, Ray would promptly apply for certification. He wants more work, and certification would open opportunities that are currently closed to him.

## CLAIMS FOR RELIEF

### COUNT I
### Fourteenth Amendment
### (42 U.S.C. §1983)

46. Plaintiffs repeat and reallege each of their prior allegations.

47. Under Section 1983, "[e]very person who, under color of any … ordinance, regulation, custom, or usage, … subjects, or causes to be subjected, any … person … to the deprivation of any rights, privileges, or immunities secured by the Constitution … , shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding." 42 U.S.C. §1983.

48. Section 1983 lets plaintiffs sue local governments and officials for equitable relief and damages when they violate federal rights.

49. Associations can sue on behalf of their members under §1983. *See Defending Educ. v. Croton-Harmon Union Free Sch. Dist.*, ___ F.4th ____ (2d Cir. Sept. 15, 2026) (mini en banc).

50. Defendants are all City officials or agencies acting under the color of New York law, which calls the City's municipal government into being and authorizes its continued existence. *See* N.Y. Const. art. IX, §2. Defendants have all violated Ray's federal rights by denying him equal protection, in violation of the Fourteenth Amendment. *See* U.S. Const. amend. XIV.

51. The Equal Protection Clause prohibits racial preferences by any government actor—no matter what race is burdened or benefited. Its "core purpose" is "doing away with all governmentally imposed discrimination based on race." *Harvard*, 600 U.S. at 206 (cleaned up).

52. The Fourteenth Amendment also provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, §1, cl. 1. This "Citizenship Clause was adopted against a longstanding political and legal tradition that closely associated the status of citizenship with the entitlement to legal equality." *United States v. Vaello Madero*, 596 U.S. 159, 171 (2022) (Thomas, J., concurring) (cleaned up). It, too, "guarantees citizens equal treatment." *Id.* at 179.

53. "The loss of an opportunity based on race is an actionable harm under the Equal Protection Clause." *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 176 (2d Cir. 2024). Ray has suffered and is continuing to suffer the loss of opportunities because of his race. He is a white male, and so he cannot qualify for the City's M/WBE certification

program, which confers valuable benefits, including new contracting opportunities and more money under existing opportunities. And Ray must compete against, and thus loses business to, the businesses that are certified as M/WBEs.

54. Programs that classify businesses based on the race of their owners are subject to strict scrutiny. *Adarand*, 515 U.S. at 227; *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

55. The City's M/WBE certification program classifies businesses based on the race of their owners. If at least 51 percent of a business's owners are black, Hispanic, Asian, or Native American, then that business qualifies for certification and the accompanying financial benefits. *See* Rules of the City of New York, tit. 66, §11-21, §11-22; N.Y.C. Charter §1304(f). But if fewer than 51 percent of a business's owners belong to those racial categories, then the business cannot qualify.

56. This racial classification cannot satisfy strict scrutiny because it serves no compelling interest. Only two interests possibly qualify as compelling enough to justify a racial classification: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute"; or (2) "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Harvard*, 600 U.S. at 207; *accord Louisiana v. Callais*, 146 S.Ct. 1131, 1152 (2026).

57. The certification program does not purport to promote safety in prisons.

58. The certification program does not purport to remediate specific, identified instances of past illegal discrimination. The City cannot rely on "a generalized assertion that there has been past discrimination in an entire industry." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). And "[s]tatistical disparities don't cut it" either. *Vitolo*, 999 F.3d at 361.

59. Nor are the City's means narrowly tailored. Among other reasons, the racial categories it uses are too "imprecise." *Harvard*, 600 U.S. at 216. Contracting opportunities are "zero-sum," so the City treats race as a "negative." *Id.* at 218-19. The program operates as a hard quota by completely excluding white-male-owned businesses. And its use of race has no end point, *id.* at 221-25, especially as the City is doubling down on it in 2026.

60. Though the City's M/WBE program also discriminates based on sex, that additional form of discrimination does not insulate the program's use of race. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982); *Hunter v. Underwood*, 471 U.S. 222, 231-32 (1985). For the same reasons already given, *supra* ¶¶58-59, that discrimination is itself unconstitutional because it fails intermediate scrutiny, *see Vitolo*, 999 F.3d at 364-65. And at a minimum, the sex-based preference is inseverable from the race-based preference, both textually and because the City would not have intended the program to operate that way. *See All. for Fair Bd. Recruitment v. Weber*, 2023 WL 3481146, at *3 (E.D. Cal. May 15).

61. Defendants are liable to Ray for damages, including punitive damages. They caused Ray to lose opportunities to work with the public schools. And they acted with reckless indifference to Ray's civil rights. It has been clear since the Supreme Court's 1995 decision in *Adarand* that it is unconstitutional to favor one race over others in contracting. Yet, even in the wake of *Harvard*, Defendants have continued this illegal discrimination, with the specific, proud intent of favoring certain races over others.

## COUNT II
### Section 1981
### (42 U.S.C. §1981)

62. Plaintiffs repeat and reallege each of their prior allegations.

63. Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). It authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975). And it applies to governmental actors when plaintiffs sue under §1983, as Plaintiffs do here. *Congregation Rabbinical Institute of Tartikov v. Vill. of Pomona*, 2026 WL 2907672, at *30 n.13 (S.D.N.Y. Sept. 28).

64. Ray is protected by §1981, as its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up).

65. Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *AAER v. Fearless Fund*, 103 F.4th 765, 776 (11th Cir. 2024). The statute "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's Pizza*, 546 U.S. at 476. A contract under §1981 includes "an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration." *Fearless Fund*, 103 F.4th at 775 (quoting 17A Am. Jur. 2d Contracts §1).

66. The City has denied and is continuing to deny Ray contractual opportunities because of his race. On many occasions, Ray has sought to contract with the City and its public schools. Time and again, the City and its schools have denied him opportunities to contract because he is not a racial minority and because he cannot get certified as an M/WBE. The

City's policies have deprived Ray of work, even when individual schools were eager to hire him.

67. The City is liable to Ray for damages, including punitive damages. *Supra* ¶61. Since at least 2003, the law has been clear that racial discrimination that fails strict scrutiny under the Equal Protection Clause equally violates §1981. *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).

## PRAYER FOR RELIEF

68. Plaintiffs respectfully ask this Court to enter judgment for Plaintiffs and against Defendants and to enter the following relief:

A. A declaratory judgment that the City's M/WBE certification program violates the Fourteenth Amendment and 42 U.S.C. §1981;

B. An injunction barring Defendants from certifying businesses under the M/WBE certification program or granting any special benefits to businesses that are M/WBE-certified;

C. An injunction ordering Defendants to make M/WBE certification available to businesses regardless of race or sex;

D. Compensatory damages for Ray;

E. Punitive damages for Ray;

F. Nominal damages;

G. Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws; and

H. All other relief that Plaintiffs are entitled to.

Dated: October 1, 2026

Respectfully submitted,

*/s/ Daniel M. Vitagliano*
Thomas R. McCarthy*
Cameron T. Norris*
Daniel M. Vitagliano†
(SDNY Bar No. 5856703)
Tyler A. Dobbs*†
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
tom@consovoymccarthy.com
cam@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
tdobbs@consovoymccarthy.com

* *Pro hac vice applications forthcoming*
† *Supervised by principals of the firm admitted to practice in Virginia*